**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NBA PROPERTIES, INC., MLB ADVANCED ) MEDIA, L.P., MAJOR LEAGUE BASEBALL ) PROPERTIES, INC., NHL ENTERPRISES, ) L.P., COLLEGIATE LICENSING COMPANY, ) LLC, and AUBURN UNIVERSITY, ) ) Plaintiff, ) ) v. ) ) THE PARTNERSHIPS and ) UNINCORPORATED ASSOCIATIONS ) IDENTIFIED ON SCHEDULE "A," ) ) ) ) Defendants. ) ) | Case No. 17-cv-02748 |

**COMPLAINT**

Plaintiffs NBA Properties, Inc. ("NBAP"), MLB Advanced Media, L.P. ("MLBAM"), Major League Baseball Properties, Inc. ("MLBP"), NHL Enterprises, L.P. ("NHLE"), Collegiate Licensing Company, LLC ("CLC"), and Auburn University ("Auburn"), collectively "Plaintiffs," hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

**I. JURISDICTION AND VENUE**

1.       This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are

so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, commercial Internet stores operating under the Defendant Domain Names and/or the Online Marketplace Accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores").  Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase unlicensed counterfeit products using Plaintiffs' trademarks.  Each of the Defendants targets sales from Illinois residents by operating online stores that offer for sale unlicensed counterfeit products using one or more of Plaintiffs' trademarks to residents of Illinois, offer shipping to the United States, including Illinois, accept payment in U.S. dollars, and on information and belief, has sold and continues to sell products using counterfeit versions of Plaintiffs' trademarks.  In fact, the commercial nature of the Defendant Internet Stores and Defendants' intent to sell to Illinois residents is further confirmed by purchases that have been ordered from a sampling of the Defendant Internet Stores. Accordingly, each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.      This action has been filed by Plaintiffs to combat online counterfeiters who trade upon Plaintiffs' reputation and goodwill by selling and/or offering for sale unauthorized and unlicensed counterfeit products using counterfeits of one or more of the trademarks owned and/or licensed by the Plaintiffs (the "Counterfeit Products").  Defendants create the Defendant Internet Stores by the thousands and design them to appear to be selling licensed products featuring one or more of the trademarks owned and/or licensed by Plaintiffs, while, upon information and belief, actually selling Counterfeit Products to unknowing consumers who make purchases from the Defendant Internet Stores.  The Defendant Internet Stores share unique identifiers, such as design elements of and/or similarities to the counterfeit products offered for sale, establishing a logical relationship among them and suggesting that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences.  Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their counterfeiting operation.  Plaintiffs are forced to file these actions to combat Defendants' counterfeiting of the trademarks owned or licensed by the Plaintiffs, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet.  Plaintiffs have been irreparably harmed and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

### III. THE PARTIES

**The Plaintiffs**

**NBA Properties, Inc.**

4.      Plaintiff NBAP is a corporation duly organized and existing under the laws of the State of New York with its principal place of business at 645 Fifth Avenue, New York, New York.

5.      The National Basketball Association ("NBA") is an unincorporated association and professional basketball league, comprised of thirty (30) member teams ("NBA Teams"), including the Chicago Bulls, that provide professional basketball entertainment services and that collectively own NBAP.   NBAP manages trademark affairs, including licensing and enforcement, for the NBA and NBA Teams.

6.      NBAP is the owner and/or the exclusive licensee of the famous and distinctive trademarks of the NBA and the NBA Teams, and is authorized to enforce the rights in those trademarks.   NBAP commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NBA and the NBA Teams (collectively, the "NBA Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that NBAP and the NBA Teams have adopted and used in commerce throughout the United States, including in Illinois.   NBAP owns more than one hundred fifty (150) United States Federal Trademark Registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel, such as jerseys, shirts, caps, and other products in international class 25.   Among the NBA Trademarks

4

owned by NBAP and registered before the United States Patent and Trademark Office are the word mark "NBA" (reg. no. 1,833,902) and the NBA Player Silhouette Logo: (reg. no. 1,966,924). A partial list of the famous and distinctive NBA Trademarks owned by NBAP, registered before the United States Patent and Trademark Office, and currently in use in commerce includes the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,833,902 | NBA | For: clothing, namely, hosiery, footwear, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands and wrist bands in class 025. |
| 2,183,983 | NATIONAL BASKETBALL ASSOCIATION | For: clothing, namely, hosiery, footwear, t-shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs and gloves in class 025. |
| 2,157,039 |  | For: clothing, namely, hosiery, footwear, sweat shirts, sweatpants, pants, tank tops, jersey, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, warm-up suits, parkas, coats, cloth bibs, head bands and wrist bands in class 025. |
| 1,525,782 |  | For: hosiery, footwear, t-shirts, sweat shirts, tank tops, pajamas, sport shirts, belts, nightshirts, stocking caps, warm-up or jogging suits, jackets, bibs, head bands and wrist bands in class 025.<br><br>For: entertainment services, namely, organizing and conducting basketball exhibitions in class 041. |

| | | |
|---|---|---|
| 2,079,493 |  | For: clothing, namely, hosiery, footwear, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, warm-up suits, parkas, coats, cloth bibs, head bands and wrist bands in class 025. |
| 1,966,924 |  | For: clothing, namely hosiery, footwear, t-shirts, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs, and gloves in class 025. |

The above U.S. registrations for the NBA Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the NBA Trademarks constitute *prima facie* evidence of their validity and of NBAP's exclusive right to use the NBA Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above NBA Trademarks are attached hereto as **Exhibit 1**.

7.      The NBA brand of professional basketball and NBA Trademarks are widely known to and enormously popular with both sports fans and the general public. NBAP has promoted and advertised the NBA, the NBA Teams and NBA Trademarks extensively for many years. NBA Trademarks are among the most renowned and immediately recognizable marks in professional sports today. As a result of substantial advertising, promotion and media attention, and NBAP's extensive licensing and sponsorship program for a wide variety of goods and services, NBA Trademarks have acquired secondary meaning and represent significant goodwill of great value to NBAP, the NBA and the NBA Teams.

8. Hundreds of millions of fans have attended NBA games and related events, enjoyed television and radio broadcasts of NBA games and related events, and purchased merchandise bearing NBA Trademarks to identify with their favorite NBA Teams. Millions visit <NBA.com>, the official NBA website, as well as the official websites of the individual NBA Teams, which prominently display, and in many cases are accessed by domain names containing, NBA Trademarks.

9. A significant aspect of NBAP's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of NBA Trademarks. NBAP has entered into numerous licensing agreements in the United States and around the world, authorizing use of NBA Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "NBA Products"). Retail sales of NBA Products exceeded $1 billion in 2016.

10. NBAP, directly and through authorized licensees, has established and maintains high standards of quality for NBA Products, and continues to maintain stringent quality control over licensees and other authorized users of NBA Trademarks.

11. In supervising licensees, NBAP provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of NBA Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality. All NBA Products are reviewed under these strict quality control procedures.

12. As a result of the extensive use of NBA Trademarks, not only in connection with the NBA's well-known basketball games and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad,

as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for NBAP, the NBA, and the NBA Teams. As a result, NBA Trademarks are famous and possess significant goodwill of great value to NBAP, the NBA and the NBA Teams.

13. To protect NBA Trademarks from infringement, dilution, disparagement, and misappropriation, NBAP, in collaboration with the Coalition to Advance the Protection of Sports logos ("CAPS"), has established a comprehensive program of trademark protection, including regularly investigating suspicious websites identified in proactive Internet sweeps and reported by consumers.

**MLB Advanced Media, L.P. and Major League Baseball Properties, Inc.**

14. MLBAM is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 75 Ninth Avenue, New York, New York 10011. Its general partner is MLB Advanced Media, Inc., a Delaware corporation with its principal place of business at 75 Ninth Avenue, New York, New York 10011.

15. MLBAM is the Internet and interactive media company of Major League Baseball. MLBAM was established following a unanimous vote by the owners of the 30 Major League Baseball clubs (the "MLB Clubs") to centralize the Internet and interactive media operations of Major League Baseball. MLBAM manages and operates the official Major League Baseball site, <MLB.com>, and each of the official MLB Club sites (e.g., <cubs.com> and <whitesox.com>) to create the most comprehensive Major League Baseball resource on the Internet.

8

16.    MLBP is a New York corporation with its principal place of business at 245 Park Avenue, New York, New York 10167.

17.    MLBP is owned by the Office of the Commissioner of Baseball (the "BOC"), and is a licensee of, and acts as agent for, the MLB Clubs, the BOC and their affiliates and related entities (collectively, with MLBAM and MLBP, the "MLB Entities") with respect to a variety of matters including the licensing and protection of the MLB Clubs' trademarks (including those of the Chicago Cubs and Chicago White Sox) throughout the world.

18.    Pursuant to agreements among the MLB Entities, MLBAM and MLBP (collectively, "MLB") are the owners and/or the exclusive licensees of the famous and distinctive trademarks of the MLB Entities, and are authorized to enforce the rights in those trademarks.

19.    MLB commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the MLB Entities (collectively, the "MLB Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that MLB Entities have adopted and used in commerce throughout the United States, including in Illinois.  The MLB Entities own more than one hundred fifty (150) United States federal trademark registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel, such as jerseys, shirts, caps, and other products in international class 25.  Among MLB Trademarks are the word mark "MAJOR LEAGUE BASEBALL" (reg. no. 1,620,020) and the MLB silhouette logo:  (reg. no. 1,617,698).  A non-exhaustive list of the famous and distinctive MLB Trademarks owned by

certain MLB Entities, registered before the United States Patent and Trademark Office, and currently in use in commerce, include the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,617,698 |   MAJOR LEAGUE BASEBALL | For: clothing, namely, shirts, shorts, dresses, socks, underwear, jackets, sweaters, pants, visors, caps, bibs, infantwear, namely, baby shorts sets, romper sets, baby pants, coveralls; outerwear, namely, uniforms and pullovers, ties, robes and loungewear, sweatshirts, knitted headwear, hosiery, wristbands, robes, and shoes in class 025. |
| 1,620,020 | MAJOR LEAGUE BASEBALL | For: clothing, namely, shirts, shorts, dresses, socks, underwear, jackets, sweaters, pants, visors, caps, bibs, infantwear, namely, baby shorts sets, romper sets, baby pants, coveralls; outerwear, namely, uniforms and pullovers, ties, robes and loungewear, sweatshirts, knitted headwear, hosiery, wristbands, robes and shoes in class 025. |
| 2,573,503 |  | For: clothing, namely, caps, hats, visors, knitted headwear, shirts, t-shirts, tank tops, sweaters, turtlenecks, pullovers, vests, shorts, baseball uniforms, jerseys, warm-up suits, sweatshirts, sweatpants, underwear, boxer shorts, robes, sleepwear, jackets, cloth bibs, infantwear, infant diaper covers, cloth diaper sets with undershirt and diaper cover, rompers, coveralls, creepers, baby booties, ties, belts, wristbands, scarves, footwear, socks, slippers, aprons in class 025. |
| 2,779,958 | MLB | For: clothing, namely, caps, hats, visors, knitted headwear, headbands, shirts t-shirts, tank tops, sweaters, turtlenecks, pullovers, vests, shorts, pants, dresses, baseball uniforms, jerseys, sweatshirts, sweatpants, underwear, boxer shorts, sleepwear, jackets, cloth bibs, infantwear, rompers, coveralls, creepers, baby booties, ties, wristbands, scarves, socks, hosiery in class 025. |

The above U.S. registrations for the MLB Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the MLB

Trademarks constitute *prima facie* evidence of their validity and of MLB's exclusive right to use the MLB Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above MLB Trademarks are attached hereto as **Exhibit 2**.

20. MLB Trademarks are widely known to and enormously popular with both sports fans and the general public. MLB has promoted and advertised the MLB Clubs, games between the MLB Clubs, related events, and MLB Trademarks extensively for many years. MLB Trademarks are among the most renowned and immediately recognizable marks in professional sports today. As a result of substantial advertising, promotion and media attention, and MLB's extensive licensing and sponsorship program for a wide variety of goods and services, MLB Trademarks have acquired secondary meaning and represent significant goodwill of great value to the MLB Entities.

21. Hundreds of millions of customers have attended games between the MLB Clubs and related events, enjoyed television and radio broadcasts of games between the MLB Clubs and related events, and purchased merchandise bearing MLB Trademarks to identify with their favorite MLB Clubs. Millions visit <MLB.com>, the official Major League Baseball website, as well as the official websites of the individual MLB Clubs, which prominently display, and in many cases are accessed by domain names containing, MLB Trademarks.

22. A significant aspect of MLB's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of MLB Trademarks. MLB has entered into numerous licensing agreements in the United States and around the world, authorizing use of MLB Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "MLB Products"). Retail sales of MLB Products exceeded $1 billion in 2016.

23. MLB, directly and through authorized licensees, has established and maintained high standards of quality for MLB Products, and continues to maintain stringent quality control over licensees and other authorized users of MLB Trademarks.

24. In supervising licensees, MLB provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of MLB Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality. All MLB Products are reviewed under these strict quality control procedures.

25. As a result of the extensive use of MLB Trademarks, not only in connection with well-known baseball games between the MLB Clubs and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for MLB and its affiliated and related MLB Clubs. As a result, MLB Trademarks are famous and possess significant goodwill of great value to MLB and its affiliated and related MLB Clubs.

26. To protect MLB Trademarks from infringement, dilution, disparagement, and misappropriation, MLB, in collaboration with CAPS, has established a comprehensive program of trademark protection, including regularly investigating suspicious websites identified in proactive Internet sweeps or reported by consumers. MLBP and MLBAM manage these activities on behalf of MLB.

**NHL Enterprises L.P.**

27.     Plaintiff NHLE is a Delaware limited partnership having a principal place of business at 1185 Avenue of the Americas, New York, New York.

28.     The National Hockey League ("NHL") is an unincorporated association organized as a joint venture to operate a professional ice hockey league consisting of thirty (30) member clubs (the "NHL Teams"), including the 2015 Stanley Cup Champion Chicago Blackhawks.  The NHL has existed since 1917 and has consistently attracted a large public following, both in the United States and worldwide.

29.      NHLE is the exclusive national United States licensee of the famous and distinctive trademarks of the NHL (including names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NHL) ("NHL League Trademarks"), and is authorized by the NHL to enforce the rights in the NHL League Trademarks.  In addition, NHLE is the exclusive national United States licensee of the famous and distinctive trademarks of the NHL Teams collectively (including names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NHL Teams) ("NHL Team Trademarks," and, together with the "NHL League Trademarks," the "NHL Trademarks").  NHLE is authorized by the NHL Teams to enforce the rights in the NHL Team Trademarks.  The NHL Trademarks include, but are not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that the NHL and the NHL Teams have adopted and used in commerce throughout the United States, including in Illinois.  In particular, NHLE is the exclusive United States licensee of and is authorized to enforce over one hundred (100) United States federal trademark registrations for NHL League Trademarks in a variety of

classes and for a variety of different goods and services, including, without limitation, for apparel such as jerseys, shirts, caps, and other products in international class 25. Among the NHL League Trademarks are the word mark "NHL" (reg. no. 1,962,135) and the NHL Logo:

 (reg. no. 3,248,499). A non-exhaustive list of the NHL League Trademarks, registered with the United States Patent and Trademark Office and currently in use in commerce, includes the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 3,248,499 |  | For: clothing, namely, bandannas, beach cover-ups, belts, body suits, boxer shorts, caps, cloth bibs, coats, dresses, footwear, ear muffs, gloves, hats, headbands, hosiery, housecoats, jackets, jerseys, leggings, leotards, mittens, nightshirts, pajamas, pants, rain coats, rain wear, robes, scarves, shirts, shorts, skirts, socks, suits, sun visors, suspenders, sweaters, sweatpants, sweatshirts, swimsuits, swim trunks, t-shirts, ties, toques, underwear, vests, warm-up suits and wristbands in class 025. |
| 1,962,135 | NHL | For: clothing, namely, shirts, jerseys, sweaters, jackets, sweatshirts, t-shirts, pants, sweatpants, warm-up suits, wristbands, headbands, shorts, caps, hats, socks, nightshirts, scarves, mittens and cloth bibs in class 025. |
| 1,678,612 |  | For: clothing and footwear; namely, jerseys, sweaters, jackets, sweatshirts, t-shirts, sweatpants, shirts, caps, hats in class 025. |
| 2,422,903 | STANLEY CUP | For: clothing, namely, caps, cloth bibs, hats, jackets, jerseys, shirts, shorts, sweaters, sweatpants, sweatshirts, t-shirts, ties, vests and warm-up suits in class 025. |

| 2,395,418 |  | For: clothing, namely, caps, cloth bibs, hats, jackets, jerseys, shirts, shorts, sweaters, sweatpants, sweatshirts, t-shirts, ties, vests and warm-up suits in class 025. |
|---|---|---|

The above U.S. registrations for the NHL League Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the NHL League Trademarks constitute *prima facie* evidence of their validity and of NHLE's exclusive right to use the NHL Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above NHL League Trademarks are attached hereto as **Exhibit 3**.

30.     The NHL brand of professional hockey and NHL Trademarks are widely known to and enormously popular with both sports fans and the general public. NHLE has promoted and advertised the NHL, the NHL Teams and NHL Trademarks extensively for many years. NHL Trademarks are among the most renowned and immediately recognizable marks in professional sports today. As a result of substantial advertising, promotion and media attention, and NHLE's extensive licensing and sponsorship program for a wide variety of goods and services, NHL Trademarks have acquired secondary meaning and represent significant goodwill of great value to the NHL, NHLE and the NHL Teams.

31.     Millions of fans have attended NHL games and related events, enjoyed television and radio broadcasts of NHL games and related events, and purchased merchandise bearing NHL Trademarks to identify with their favorite NHL Teams. Millions visit <NHL.com>, the official NHL website, as well as the official websites of the individual NHL Teams, which prominently display, and in many cases are accessed by domain names containing, NHL Trademarks.

32.     A significant aspect of NHLE's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of the NHL Trademarks. NHLE has entered into numerous licensing agreements in the United States, authorizing use of NHL Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "NHL Products").   Retail sales revenue in 2016 of NHL Products was in the hundreds of millions of dollars.

33.     NHLE, directly and through authorized licensees, has established and maintained high standards of quality for NHL Products, and continues to maintain stringent quality control over licensees and other authorized users of NHL Trademarks.

34.     In supervising licensees, NHLE provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of NHL Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.  All NHL Products are reviewed under these strict quality control procedures.

35.     As a result of the extensive use of NHL Trademarks, not only in connection with the NHL's well-known hockey games and related events, but also in connection with a wide variety of licensed merchandise sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for NHLE, the NHL, and the NHL Teams.  As a result, NHL Trademarks are famous and possess significant goodwill of great value to the NHL, the NHL Teams and NHLE.

36.     To protect NHL Trademarks from infringement, dilution, disparagement, and misappropriation, NHLE, in collaboration with CAPS, has established a comprehensive program of trademark protection, including regularly investigating suspicious websites identified in proactive Internet sweeps and reported by consumers.

**Collegiate Licensing Company, LLC**

37.     Plaintiff CLC is a Georgia limited liability company having its principal place of business at 1075 Peachtree Street, Suite 3300, Atlanta, Georgia 30309.

38.     Plaintiff CLC is a trademark licensing and enforcement agent that represents more than 190 colleges, universities, bowl games, and collegiate athletic conferences, including Auburn.

39.     In addition to Auburn, CLC is the trademark licensing agent for numerous other collegiate institutions including, without limitation, the University of Alabama, the University of Oklahoma, Oklahoma State University, the University of California Los Angeles, the University of Nebraska, West Virginia University, the University of Florida, Duke University, and the University of South Carolina (collectively, "Additional CLC University Clients") whose trademarks (the "Additional CLC Protected Trademarks") are used on Counterfeit Products without authorization and sold by one or more Defendants.  Although not named as Plaintiffs herein, the Additional CLC University Clients have been and continue to be damaged by the unauthorized trademark use of the Defendants, and CLC suffers harm and damages as a result of these actions.

40.     A significant aspect of CLC's business has been for many years, and continues to be, the licensing of famous collegiate trademarks including, but not limited to, the AUBURN Trademarks [not defined until page 19], which are owned by Plaintiff Auburn, as well as the

Additional CLC Protected Trademarks (collectively, the "Collegiate Trademarks"). Indeed, the efforts of CLC together with the enormous popularity of the Collegiate Trademarks create valuable licensing royalties that support a myriad of programs and operations of Auburn and the Additional CLC University Clients. CLC, on behalf of Auburn and the Additional CLC University Clients, has entered into numerous trademark licensing agreements in the United States and around the world, authorizing use of famous Collegiate Trademarks on a wide variety of products, including jerseys, caps, other apparel, and many other products. As CLC generates revenues based upon the sale of licensed products, CLC is damaged by the sale of Counterfeit Products, which decreases sales of licensed Genuine Products and thus causes CLC significant financial and irreparable harm.

41. CLC also uses its trademarks (collectively, the "CLC Trademarks") in connection with the licensed products using Collegiate Trademarks. The United States Patent and Trademark Office has granted CLC numerous federal registrations for the CLC Trademarks, including, but not limited to, the following registrations:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,578,038 |  | For: licensing services in the field of collegiate products and promotions for colleges, universities and post-season bowls in class 035. |
| 1,891,318 | THE COLLEGIATE LICENSING COMPANY | For: business consultation in the field of trademark licensing management, market development in the field of trademark licensing programs and administration of trademark licensing for others in class 035. |

| | | |
|---|---|---|
| 1,891,319 | CLC | For: business consultation in the field of trademark licensing management, market development in the field of trademark licensing programs and administration of trademark licensing for others in class 035. |
| 2,071,504 |  | For: printed matter, namely, newsletters regarding collegiate licensing in class 016.<br><br>For: licensing services in the field of collegiate products and promotions for colleges, universities and post-season bowls in class 035. |
| 3,163,116 | COLLEGE VAULT | For: clothing, namely, sweatshirts, sweatpants, shirts, T-shirts, sweaters, hats, caps, jackets, coats, uniforms, jerseys, undergarments, scarves, ties, visors, shorts, rainwear, and gloves in class 025. |
| 3,221,094 |  | For: prerecorded audio cassettes, compact discs, prerecorded video cassettes, and DVDs featuring football game highlights and/or music, video game cartridges, video game discs, and video game software, decorative magnets, computer software in the nature of screen savers, computer mouse pads, neon signs, sunglasses, and telephones in class 009.<br><br>For: jewelry including watches, clocks, charms, pendants, earrings, cuff links, powder compacts of precious metal, lapel pins, tie tacks and bars, medals, and commemorative coins in class 014.<br><br>For: paper and paper products, namely, spiral notebooks, pens, pencils, greeting cards, postcards, prints, letter openers, decals, bumper stickers, calendars, paper napkins, note pads, checkbook covers, bank checks, bookmarks, loose |

| | | |
|---|---|---|
| | | leaf binders, stationery-type portfolios, desk sets, book covers, bookends, trading cards, pen and pencil cases, paper weights, posters, and stickers in class 016.<br><br>For: luggage, namely, athletic bags, attache cases, backpacks, barrel bags, book bags, duffel bags, tote bags, garment bags for travel, wallets, billfolds, purses, briefcase-type portfolios, key cases, business and credit card cases, change purses, umbrellas, patio umbrellas, animal leashes and collars for pets in class 018.<br><br>For: furniture and plastics, namely, mirrors, picture frames, pillows, plaques, and wind chimes in class 020.<br><br>For: house wares and household goods, namely, non-metal piggy banks, wicker baskets, beer mugs, portable beverage coolers, drinking glasses, bottle openers, lunch boxes, soap dishes, ice buckets, coasters not of paper and not being table linen, coffee cups, plates, commemorative plates, paper plates, cookie jars, bowls, shot glasses, fitted picnic baskets, stained glass decorations, statues made of china, crystal, glass, or porcelain, and plastic cups in class 021.<br><br>For: textiles, namely, textile fabrics for home and commercial interiors, curtains, cloth pennants, cloth flags, bed blankets, throw blankets, bed sheets, pillow cases, bed spreads, pot holders, kitchen towels, oven mitts, bath towels, and washcloths in class 024.<br><br>For: apparel, namely, t-shirts, polo shirts, rugby tops, jerseys, turtlenecks, infant one piece outfits, pajamas, boxer shorts, nightshirts, tank tops, shorts, |

| | | pants, jeans, socks, ties, scarves, shoes, slippers, sandals, nightgowns, sweatpants, sweatshirts, wristbands, head bands, hats, caps, visors, aprons, blazers, vests, jackets, raincoats, ponchos, leather coats, wind resistant jackets, warm up suits, athletic uniforms, bandanas, suspenders, cloth bibs, booties, bathing trunks, bikinis, gloves, mittens, bathing suits, bathing caps, and belts in class 025.

For: games and playthings, namely, stuffed toy animals, stuffed toys, balloons, board games, flying discs, dolls, toy vehicles, plush toys, toy banks, playing cards, bean bags, basketballs, footballs, miniature basketball hoop and backboard, golf balls, golf clubs, golf putters, golf club covers, golf tees, golf gloves, basketball backboard, yo-yos, ornaments for the Christmas tree, snow globes in class 028. |
|---|---|---|

The above U.S. registrations for the CLC Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the CLC Trademarks constitute *prima facie* evidence of their validity and of CLC's exclusive right to use the CLC Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above CLC Trademarks are attached hereto as **Exhibit 4**.

42.     As a result of the extensive use of CLC Trademarks in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for CLC. As a result, CLC Trademarks are famous and possess significant goodwill of great value to CLC.

43.     To protect CLC Trademarks from infringement, dilution, disparagement, and misappropriation, CLC, in collaboration with CAPS, has established a comprehensive program of trademark protection, including regularly investigating suspicious websites identified in proactive Internet sweeps and reported by consumers.

**Auburn University**

44.     Plaintiff Auburn is a public body corporate and instrumentality of the State of Alabama having its principal place of business at Auburn, Alabama 36849.

45.     Auburn was founded in 1856 as a land grant institution.  Today, Auburn is one of the largest universities in the South.  Auburn's fall 2015 semester enrollment exceeded 27,000, and Auburn has over 250,000 alumni.

46.     As a member of the Southeastern Conference (the "SEC"), Auburn competes in 15 Division I intercollegiate varsity sports.  Through the 2014-2015 athletic year, AUBURN has won a total of 19 National Championships, including 2 football national championships, 8 men's swimming and diving championships, 5 women's swimming and diving championships, 3 equestrian championships, and 1 women's outdoor track and field championship.  In 2010, Auburn won the BCS National Championship after a perfect 14-0 season and bowl win against Oregon University in the national title game.  Auburn has also earned 89 conference championships, led by men's swimming and diving (18 titles) and football (12 titles).

47.     Auburn is the owner of the famous and distinctive trademarks of Auburn and is responsible for protecting those trademarks.  Auburn commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with Auburn (collectively, the "AUBURN Trademarks"), including, but not limited to, those that are the

subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that Auburn has adopted and used in commerce throughout the United States, including in Illinois. Auburn owns more than ten United States federal trademark registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel such as jerseys, shirts, caps, and other products in international class 25. Among the AUBURN Trademarks are the word mark "AUBURN" (reg. no. 2,054,439), the word mark "AUBURN TIGERS" (reg. no. 2,164,990), the word mark "WAR EAGLE" (reg. no. 2,033,762) and the Auburn Logo:  (reg. no. 2,028,684). A non-exhaustive list of the famous and distinctive AUBURN Trademarks owned and/or licensed by Auburn, registered before the United States Patent and Trademark Office, and currently in use in commerce include the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 2,080,848 | AUBURN UNIVERSITY | For: clothing, namely, shirts, shorts, T-shirts, sleep shirts, robes, tennis shirts, sweat suits, sweat pants, sweat shirts, sweat shorts, ladies tops, jerseys, sweaters, blazers, jackets, vests, shoes, mittens, scarves, socks, hats, caps, visors, and children's clothing, namely, bibs, jumpers, onesies, booties, and baby bottoms in class 025. |
| 2,164,990 | AUBURN TIGERS | For: clothing, namely, shirts, shorts, T-shirts, sleep shirts, robes, tennis shirts, sweat suits, sweat pants, sweat shirts, sweat shorts, ladies tops, jerseys, sweaters, blazers, jackets, vests, shoes, mittens, scarves, socks, hats, caps, visors, and children's clothing, namely, bibs, jumpers, onesies, booties, and baby bottoms in class 025. |

| | | |
|---|---|---|
| 2,028,684 |  | For: clothing, namely, shirts, shorts, T-shirts, sleep shirts, robes, tennis shirts, sweat suits, sweat pants, sweat shirts, sweat shorts, ladies tops, jerseys, sweaters, blazers, jackets, vests, shoes, mittens, scarves, socks, hats, caps, visors, and children's clothing, namely, bibs, jumpers, onesies, booties, and baby bottoms in class 025. |
| 2,054,439 | AUBURN | For: clothing, namely, shirts, shorts, T-shirts, sleep shirts, robes, tennis shirts, sweat suits, sweat pants, sweat shirts, sweat shorts, ladies tops, jerseys, sweaters, blazers, jackets, vests, shoes, mittens, scarves, socks, hats, caps, visors, and children's clothing, namely, bibs, jumpers, onesies, booties, and baby bottoms in class 025. |
| 2,033,762 | WAR EAGLE | For: clothing, namely, shirts, shorts, T-shirts, sleep shirts, robes, tennis shirts, sweat suits, sweat pants, sweat shirts, sweat shorts, ladies' tops, jerseys, sweaters, blazers, jackets, vests, ties, shoes, mittens, scarves, socks, hats, caps, visors and children's clothing, namely, jumpers, cloth bibs, baby booties, onesies and baby pants in class 025. |
| 2,471,635 |  | For: clothing, namely, shirts, shorts, t-shirts, sleep shirts, robes, tennis shirts, sweat suits, sweat pants, sweat shirts, sweat shorts, ladies tops, jerseys, jackets, vests, shoes, mittens, scarves, socks, hats, caps, visors, and children's clothing, namely, bibs, jumpers, infant wear, booties, and baby bottoms in class 025. |
| 3,343,650 | AU | For: Ankle bracelets; Bracelets; Rubber or silicon wristbands in the nature of a bracelet; Identification bracelets; Rings being jewelry; Watch bracelets; Clocks; Collectible coins; Commemorative coins; Earrings; Jewelry watches; Lapel pins; Necklaces; Non-monetary coins in class 014.<br><br>For: Art prints; Pressure sensitive graphics for application to automobiles; Book covers; Note books; Wirebound books; Address books; Appointment books; Blank journal books; Check books; Checkbook covers; Composition books; Data books; Memorandum books; Bank checks; Bulletin boards; Bumper stickers; Calendars; Children's books; Coasters made of paper; Cook books; Desktop business card holders; Memory books; Paperweights; Decals; Dry erase writing boards and writing surfaces; Letter openers; Paper flags; Gift cards; Gift |

| | | |
|---|---|---|
| | | wrap paper; Paper gift tags; Driver's license holders; Blank writing journals; Money clips; Pens; Stands for pen and pencil; Paper napkins; Note cards; Note pad holders; Stationery-type portfolios; Postcards; Posters; Scrapbook albums; Scrapbook pages; Stencils; Stickers; Temporary tattoos; Three-ring binders; Bathroom tissue; Paper table cloths in class 016.<br><br>For:  Aprons; Bandanas; Baseball caps; Bathing suits; Belts; Booties; Sports jerseys; Boxer shorts; Children's and infants' cloth bibs; Athletic uniforms; Dress shirts; Golf shirts; Sweat shirts; T-shirts; Wind shirts; Flip flops; Footwear; Gloves; Golf shoes; Hats; Headbands; Jackets; Jeans; Lingerie; Loungewear; Pants; Sport coats; Pajamas; Panties; Scrubs not for medical purposes; Ponchos; Rainwear; Robes; Sandals; Scarves; Rugby tops; Shorts; Slippers; Socks; Sweaters; V-neck sweaters; Tank tops; Tennis shoes; Ties; Turtlenecks; Vests; Visors; Wristbands in class 025. |
| 4,515,037 | WAR DAMN EAGLE | For:  Fleece tops, headwear; shirts, and T-shirts in class 025. |
| 4,237,775 |  | For:  Baseball caps; Beanies; Boxer briefs; Boxer shorts; Button down shirts; Caps; Costumes for use in children's dress up play; Dress shirts; Dresses; Ear muffs; Fleece bottoms; Fleece tops; Flip flops; Gloves; Golf shirts; Hats; Head wear; Headwear; Hooded sweat shirts; Knit shirts; Long-sleeved shirts; Overalls; Pants; Scarfs; Shirts; Shirts for infants, babies, toddlers and children; Short-sleeved shirts; Shorts; Sleep shirts; Snap crotch shirts for infants and toddlers; Socks; Sweat shirts; Sweaters; T-shirts; Ties; Wind shirts; Yoga pants in class 025. |
| 4,403,233 |  | For:  Blank journals; Calendars; Decals; Notebooks; Paperweights; Stickers in class 016.<br><br>For:  Coasters not of paper and not being table linen; Cups; Drinking cups; Mugs; Trivets in class 021.<br><br>For:  Cloth banners; Cloth flags; Felt pennants; Textile wall hangings in class 024.<br><br>For:  Belts; Fleece pullovers; Headwear; Hooded pullovers; Hooded sweatshirts; Jackets; Layettes; Long-sleeved shirts; Moisture-wicking sports shirts; |

|  |  | Shirts; Short-sleeved or long-sleeved t-shirts; Sweatshirts; T-shirts in class 025. |
|---|---|---|

The above U.S. registrations for the AUBURN Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the AUBURN Trademarks constitute *prima facie* evidence of their validity and of Auburn's exclusive right to use the AUBURN Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above AUBURN Trademarks are attached hereto as **Exhibit 5**.

48.     Auburn's intercollegiate football, baseball, basketball and other athletic teams (collectively, the "Auburn Teams") and the AUBURN Trademarks are widely known to and enormously popular with both sports fans and the general public. AUBURN has promoted and advertised AUBURN, the AUBURN Teams and the AUBURN Trademarks extensively for many years. The AUBURN Trademarks are among the most renowned and immediately recognizable marks in college sports today. As a result of substantial advertising, promotion and media attention, and AUBURN's extensive licensing and sponsorship program for a wide variety of goods and services, the AUBURN Trademarks have acquired secondary meaning and represent significant goodwill of great value to AUBURN and the AUBURN Teams.

49.     Millions of fans have attended Auburn sports games and related events, enjoyed television and radio broadcasts of Auburn games and related events, and purchased merchandise bearing the AUBURN Trademarks to identify with their favorite Auburn Team. Thousands more visit <auburntigers.com>, the official Auburn athletics website, which prominently displays the AUBURN Trademarks.

50.     A significant aspect of Auburn's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of the AUBURN Trademarks.

Auburn, in conjunction with its licensing agent CLC, has entered into numerous licensing agreements in the United States and around the world, authorizing use of the AUBURN Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "Auburn Products"). Retail sales revenue in 2015 of Auburn Products totaled almost 70 million dollars.

51.    Auburn, directly and through authorized licensees, has established and maintained high standards of quality for Auburn Products, and continues to maintain stringent quality control over licensees and other authorized users of the AUBURN Trademarks.

52.    In supervising licensees, Auburn provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of the AUBURN Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality. All Auburn Products and designs appearing thereon are reviewed under these strict quality control procedures.

53.    As a result of the extensive use of the AUBURN Trademarks, not only in connection with Auburn's well-known sports games, exhibitions and services, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for Auburn and the affiliated and related Auburn Teams. As a result, the AUBURN Trademarks are famous and possess significant goodwill of great value to Auburn and its affiliated and related Auburn Teams.

54.     The MLB Trademarks, the NBA Trademarks, the NHL Trademarks, the CLC Trademarks, and the AUBURN Trademarks are hereinafter collectively referred to as "Plaintiffs' Trademarks."

**The Defendants**

55.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions.   Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores.   Each Defendant targets the United States, including Illinois, and has offered to sell Counterfeit Products to consumers within the United States, including the State of Illinois.

56.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using counterfeit versions of many of Plaintiffs' Trademarks in the same transaction, occurrence, or series of transactions or occurrences.   Tactics used by Defendants to conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their counterfeit network.   In the event that Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

### IV. DEFENDANTS' UNLAWFUL CONDUCT

57.     The fame of Plaintiffs' Trademarks and the success of Plaintiffs' respective athletic brands and affiliated variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "Plaintiffs' Genuine Products"), has resulted in

significant counterfeiting of the trademarks owned by these entities. TM Management Inc. ("TMMI") administers Coalition to Advance the Protection of Sports logos ("CAPS") on behalf of its members, MLBP, NHLE, NBAP, CLC and NFL Properties, LLC. CAPS has created an extensive anti-counterfeiting program, which includes regularly investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by a variety of informants in response to the significant counterfeiting of Plaintiffs' Trademarks. In recent years, CAPS, on behalf of its above-identified members, has identified thousands of domain names linked to fully interactive, commercial websites and marketplace listings on platforms such as iOffer, eBay, AliExpress, and Alibaba, including the Defendant Internet Stores, which were offering for sale and selling Counterfeit Products to consumers in this Judicial District and throughout the United States. Despite Plaintiffs' and CAPS' collective enforcement efforts, Defendants have persisted in creating the Defendant Internet Stores. Internet websites like the Defendant Internet Stores are estimated to receive tens of millions of visits per year and to generate over $135 billion in annual online sales. According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2014 was over $1.23 billion. Internet websites like the Defendant Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year.

58. Defendants facilitate sales of Counterfeit Products by designing the Defendant Internet Stores so that they appear to unknowing consumers to be legitimate online retailers, outlet stores, or wholesalers. Plaintiffs' Genuine Products are very often sold in stores (both on the ground and on the Internet) that carry products from all of the Plaintiffs, and on information

and belief, many of the Defendant Internet Stores attempt to exploit this by offering Counterfeit Products from multiple Plaintiffs. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal. Numerous Defendant Domain Names also incorporate one or more of Plaintiffs' Trademarks into the URL, and the Defendant Internet Stores often include content and design elements that make it very difficult for consumers to distinguish such counterfeit sites from a legitimate retailer selling Plaintiffs' Genuine Products. Many Defendants further perpetuate the illusion of legitimacy on the Defendant Internet Stores by falsely alleging to offer customer service and making unauthorized use of indicia of authenticity and security that U.S. consumers have come to associate with legitimate retailers, including the Visa®, MasterCard®, and/or PayPal® logos. Upon information and belief, none of the Plaintiffs have licensed or authorized Defendants to use any of Plaintiffs' Trademarks, and, upon information and belief, none of the Defendants are legitimate retailers of any of Plaintiffs' Genuine Products.

59. Upon information and belief, many Defendants also deceive unknowing consumers by using one or more of Plaintiffs' Trademarks without authorization within the content, text, and/or meta-tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for one or more of Plaintiffs' Genuine Products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for one or more of Plaintiffs' Genuine Products. Other Defendants only show Plaintiffs' Trademarks in product images while using strategic item titles

and descriptions that will trigger their listings when consumers are searching for Plaintiff's Genuine Products.

60. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their network of Defendant Internet Stores. For example, many of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information. On information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

61. Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. Many of the Defendant Internet Stores sell counterfeit versions of products purporting to emanate from all of, or nearly all of, the Plaintiffs. In addition, the Counterfeit Products for sale in many of the Defendant Internet Stores bear the same or similar irregularities and/or indicia that identifies them as being counterfeit, suggesting that the Counterfeit Products were manufactured by and/or obtained from a common source and that Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, unique shopping

31

cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, and similar name servers.

62.    In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts.   For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit.   Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received.   Rogue servers are notorious for ignoring take down demands sent by brand owners.   Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

63.    Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Plaintiffs' enforcement efforts.   On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court.   Indeed, analysis of PayPal transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

64.    Defendants, without any authorization or license from any of the Plaintiffs, have knowingly and willfully used and continue to use one or more of Plaintiffs' Trademarks in

connection with the advertisement, distribution, offering for sale, and/or sale of the Counterfeit Products into the United States and Illinois over the Internet. Each Defendant Internet Store offers Counterfeit Products for sale to residents of the United States, including Illinois, and offers shipping of Counterfeit Products to the United States, including Illinois.

65. Defendants' use of one or more of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale and/or sale of Counterfeit Products, including to residents of Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

66. Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 65.

67. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit or infringing imitations of one or more of Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiffs' Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiffs' respective products sold or marketed under Plaintiffs' Trademarks.

68. Defendants have sold, offered to sell, marketed, distributed and advertised, and are still selling, offering to sell, marketing, distributing and advertising products using counterfeit or infringing reproductions of one or more of Plaintiffs' Trademarks without Plaintiffs' permission or consent.

69. Plaintiffs are the owners and/or the exclusive licensees of their respective Plaintiffs' Trademarks. The U.S. Registrations for Plaintiffs' Trademarks (Exhibits 1-5) are in

full force and effect. Upon information and belief, Defendants have knowledge of Plaintiffs' rights in Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits or infringements of one or more of Plaintiffs' Trademarks. Defendants' willful, intentional and unauthorized use of one or more of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit or infringing goods among the general public.

70. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

71. Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputation and the goodwill of their well-known Plaintiffs' Trademarks.

72. The injuries and damages sustained by Plaintiffs have been directly and/or proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and/or sale of the Counterfeit Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

73. Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 72.

74. Defendants' promotion, marketing, offering for sale, and/or sale of the Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

75.    By using one or more of Plaintiffs' Trademarks on the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

76.    Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

77.    Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their respective reputations and the goodwill of Plaintiffs and their respective Plaintiffs' Trademarks.

**COUNT III**
**CLAIM FOR INJUNCTIVE RELIEF UNDER THE ANTICYBERSQUATTING**
**CONSUMER PROTECTION ACT (15 U.S.C. § 1125(d)) AS TO THE DEFENDANTS**
**OPERATING A DEFENDANT DOMAIN NAME INCORPORATING**
**ANY OF PLAINTIFFS' TRADEMARKS**

78.    Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 77.

79.    Plaintiffs are the exclusive owners, legal representatives and/or exclusive licensees or licensing representatives of the Plaintiffs' Trademarks, and/or have been authorized to enforce rights in the Plaintiffs' Trademarks by the owners of the Plaintiffs' Trademarks.  The U.S. Registrations for Plaintiffs' Trademarks are in full force and effect.  Additionally, Plaintiffs' Trademarks are highly distinctive and famous marks pursuant to 15 U.S.C. § 1125 and were famous before and at the time of the registration of the Defendant Domain Names.

80.    Upon information and belief, Defendants operating a Defendant Domain Name incorporating any of Plaintiffs' Trademarks have acted with bad faith intent to profit from the unauthorized use of one or more of Plaintiffs' Trademarks and the goodwill associated therewith

by registering, trafficking in, or using various domain names which are identical to, confusingly similar to, or dilutive of one or more of Plaintiffs' Trademarks.

81.     Defendants have no intellectual property rights in or to any of Plaintiffs' Trademarks, and Plaintiffs have not consented to the use of Plaintiffs' Trademarks in the Defendant Domain Names.

82.     Defendants' actions constitute willful cybersquatting in violation of §43(d) of the Lanham Act, 15 U.S.C. §1125(d).

83.     Plaintiffs have no adequate remedy at law, and the registration and use of the Defendant Domain Names incorporating the Plaintiffs' Trademarks has caused, is causing, and is likely to continue to cause substantial and irreparable injury to the public and to Plaintiffs.

**COUNT IV**
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(815 ILCS § 510, *et seq*.)**

84.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 83.

85.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their Counterfeit Products as those of one or more of the Plaintiffs, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with one or more of the Plaintiffs' Genuine Products, representing that their products have any or all of Plaintiffs' approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

86.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq*.

87.    Plaintiffs have no adequate remedy at law, and Defendants' conduct has caused Plaintiffs to suffer damage to their respective reputations and the goodwill of Plaintiffs and their respective Plaintiffs' Trademarks.  Unless enjoined by the Court, Plaintiffs will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

   a.  using any of Plaintiffs' Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, promotion, marketing, advertising, offering for sale, or sale of any product that is not one of Plaintiffs' Genuine Products or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

   b.  passing off, inducing, or enabling others to sell or pass off any products as Plaintiffs' Genuine Products or any other products produced by Plaintiffs that are not Plaintiffs', or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

   c.  committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control, or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

   d.  further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill; and

e.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any of Plaintiffs' trademarks, including the Plaintiffs' Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

2)  Entry of an Order that, at Plaintiffs' choosing, the registrant of the Defendant Domain Names shall be changed from the current registrant to Plaintiffs, and that the domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Plaintiffs' selection, and that the domain name registrars, including, but not limited to, GoDaddy Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap Inc. ("Namecheap"), shall take any steps necessary to transfer the Defendant Domain Names to a registrar account of Plaintiffs' selection; or that the same domain name registries shall disable the Defendant Domain Names and make them inactive and untransferable;

3)  Entry of an Order that, upon Plaintiffs' request, those in privity with Defendants and those with notice of the injunction, including, without limitation, any online marketplace platforms such as iOffer, eBay, AliExpress, and Alibaba, web hosts, sponsored search engine or ad-word providers, credit cards, banks, merchant account providers, third party processors and other payment processing service providers, Internet search engines such as Google, Bing,

and Yahoo, and domain name registrars, including, but not limited to, GoDaddy, Name.com, PDR, and Namecheap, (collectively, the "Third Party Providers") shall:

    a.  disable and cease providing services being used by Defendants, currently or in the future, to engage in the sale of goods using Plaintiffs' Trademarks;

    b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiffs' Trademarks; and

    c.  take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index;

4) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged and that the amount of damages for infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiffs be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiffs' Trademarks and $100,000 per domain name incorporating any of Plaintiffs' Trademarks pursuant to 15 U.S.C. § 1117(d);

6) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 11th day of April 2017.      Respectfully submitted,

/s/ Justin R. Gaudio_____
Kevin W. Guynn
Amy C. Ziegler
Justin R. Gaudio
Jessica L. Bloodgood
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
kguynn@gbc.law
aziegler@gbc.law
jgaudio@gbc.law
jbloodgood@gbc.law

*Attorneys for Plaintiffs*
*NBA Properties, Inc., MLB Advanced Media, L.P.,*
*Major League Baseball Properties, Inc., NHL*
*Enterprises, L.P., Collegiate Licensing Company,*
*LLC, and Auburn University*